A96A2167. OXLEY v. KILPATRICK et al.
(486 SE2d 44)

BEASLEY, Judge.

Mrs. Oxley, as parent and next friend of her son Ben, brought this medical malpractice action against Dr. Kilpatrick, Women's Medical Center, Inc., and Dr. Rossi. The question on appeal is whether, based on undisputed facts of record, the statute of limitation prevents the case from proceeding, as a matter of law.

The complaint alleged that defendants' negligent failure to "diagnose, appreciate and timely address" Ben's fetal distress caused him to suffer oxygen deprivation and brain injuries resulting in his cerebral palsy, and that Mrs. Oxley was deterred from discovering their negligence through fraud and misrepresentations. Plaintiff also claims that but for negligence by Dr. Kilpatrick in failing to place Mrs. Oxley on restrictions earlier in her pregnancy, Ben would not have required premature delivery and so would not have suffered fetal distress. All defendants moved for summary judgment on grounds that the statute of limitation had expired and had not been tolled by any fraud or misrepresentations. Plaintiff appeals the trial court's grant of defendants' motions.

Summary judgment is authorized only when all the facts and reasonable inferences, viewed most favorably to the non-moving party, preclude a triable issue as to at least one essential element of the case. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

Beginning in the early 1980's Mrs. Oxley became a patient of Dr. Kilpatrick, who practiced obstetrics individually and through Women's Medical Center. Mrs. Oxley's 1985 pregnancy ended in a miscarriage and she became pregnant again in 1987. She testified that Dr. Kilpatrick informed her that her second pregnancy was high risk because she had an "incompetent cervix." When she began to dilate early in her pregnancy, he performed a surgical procedure known as a "cerclage" or closure of the cervix. Dr. Kilpatrick did not put her on any restrictions such as staying off her feet or out of work.

On the evening of September 1, 1987, when Mrs. Oxley was approximately 27 weeks pregnant, she went to the hospital because of a spontaneous rupture of her membranes. Upon her arrival between 8:00 and 9:00 p.m., she was treated by Dr. Rossi, whom she had never seen before. Although Dr. Rossi is not employed by Dr. Kilpatrick or Women's Medical Center, he was on call for Dr. Kilpatrick. Mrs. Oxley testified that Dr. Rossi told her he was the third associate

in practice with Dr. Kilpatrick and Dr. Moore. Mrs. Oxley began to feel her child was in trouble at approximately 5:00 a.m. At that time, she began having contractions which were followed by the baby's heart rate going down, and she could tell by the tone of the nurses' voices that something was wrong. Dr. Rossi came at 6:00 a.m., checked the fetal heart monitor, and cut the cerclage because he was concerned it might be hurting the baby. At this time, Dr. Rossi did not express concern about the baby. After the cerclage was cut, everything was fine for about 45 minutes. According to Mrs. Oxley, Dr. Rossi told her the baby was fine and never informed her that the child was in trouble. He also told her the baby needed to develop its lungs before it could be delivered.

At approximately 7:00 a.m. on September 2, Mrs. Oxley was seen by Dr. Kilpatrick. He testified that the fetus was in distress beginning at 7:19 a.m. About one hour later, he delivered Ben by Caesarian section. While in the hospital, Mrs. Oxley was informed by the neonatologist that Ben's prematurity might cause him to have developmental problems. When Ben was approximately ten months old, Dr. Kilpatrick told her the same thing. Mrs. Oxley's medical records indicate that Ben suffered from late decelerations, cord compression, and fetal distress prior to delivery, of which conditions neither doctor informed her.

During Ben's first year, his pediatricians told Mrs. Oxley that development was slow because of his prematurity. When Ben was 18 months old, Mrs. Oxley took him to the Clayton County Early Intervention Center at the suggestion of a friend. A doctor examined him and diagnosed his cerebral palsy. Mrs. Oxley inquired as to cause and was told by a worker at the center that it was oxygen deprivation.

Mrs. Oxley remained under Dr. Kilpatrick's care until 1991. She informed him of Ben's diagnosis and questioned him about having another child. According to Mrs. Oxley, he attributed Ben's malady to her genetic condition, told her that any child she had would be worse than Ben, and advised her against having any more children.

In 1993, Mrs. Oxley became pregnant again. She began seeing Dr. Schwartz in April or May 1993 because she was informed Dr. Kilpatrick was no longer in practice. Two months after her initial visit, Dr. Schwartz reviewed Mrs. Oxley's labor and delivery records and informed her that Ben's condition was caused by oxygen deprivation from fetal distress and could have been prevented if he had been delivered earlier. Dr. Schwartz ordered Mrs. Oxley off her feet and out of work. In January 1994, she gave birth to a healthy girl. This action was commenced in May 1996.

The two-year statute of limitation for medical malpractice actions in OCGA § 9-3-71 (a) begins to run on the date on which an injury arising from an act of malpractice occurs and physically

manifests itself, rather than when the plaintiff discovers the causal relationship between the injury and the defendant's breach of duty. *Bryant v. Crider*, 209 Ga. App. 623, 625 (1) (434 SE2d 161) (1993). However, "[a] minor who has not attained the age of five years shall have two years from the date of such minor's fifth birthday within which to bring a medical malpractice action if the cause of action arose before such minor attained the age of five years." OCGA § 9-3-73 (b). In addition, "[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." OCGA § 9-3-96.

In granting the defendants' motion for summary judgment, the trial court reasoned that Mrs. Oxley consulted a number of physicians about Ben's condition, that all the prerequisites for accrual of this cause of action existed when she was informed that Ben had cerebral palsy, and that no knowing misrepresentations were made by defendants. In ruling that the statute of limitation barred the action, the court distinguished *Bynum v. Gregory*, 215 Ga. App. 431 (450 SE2d 840) (1994), and concluded that *Bryant*, supra, is controlling.

In *Bryant*, the plaintiff brought a medical malpractice action against a physician and hospital in 1991 as a result of the performance of an abortion in 1987. After the abortion, plaintiff began experiencing symptoms and consulted other physicians rather than the defendants for follow-up care. One of the other physicians attached a probable diagnosis to her symptoms in 1989. We rejected plaintiff's argument that the two-year limitation provided in OCGA § 9-3-71 (a) began to run on the date she received a diagnosis rather than at the time she began to experience symptoms and complain of them to her physicians. *Bryant*, supra at 624. On the question of whether the statute of limitation had been tolled, we held that "[o]nce a plaintiff seeks the diagnosis or care of another doctor, she is no longer deterred from learning the true facts by any conduct of a defendant. . . . [Cit.]" Id. at 627 (3).

In *Bynum*, plaintiffs sued the obstetricians who had delivered their daughter. There was evidence that defendants affirmatively misrepresented to the mother that her child's abnormal condition was caused by meningitis and failed to inform her that the pediatric diagnosis contained in the mother's medical records was brain injury due to oxygen deprivation. The mother did not inquire of subsequent treating physicians as to the cause of the condition, and brought suit within two years after becoming aware that the child did not have meningitis. We concluded that a question of fact existed as to whether the failure of the defendants to inform the mother of the etiology of the child's condition, or the alleged intentional misrepresen-

tation that the child had meningitis, was sufficient to toll the statute of limitation. *Bynum*, supra, 215 Ga. App. at 433 (1). She was entitled to rely upon her doctors' affirmative representations and had no duty to investigate or confirm the truth or accuracy of their representations. Id. at 434.

In this case, as in *Bynum*, other physicians treated the child but the mother remained under the care of the physician who delivered him. The trial court erred in taking as undisputed that no knowing misrepresentations were made by Dr. Kilpatrick. On the record, there is a material issue of fact whether he knowingly misrepresented the etiology. For so long as the mother remained under his care, she was entitled to rely on his representations. *Bynum*, supra. We cannot hold that, as a matter of law, the statute of limitation was not tolled because a physician treating the child diagnosed his condition or because a non-physician told plaintiff the cause of his condition was oxygen deprivation. Given the evidence of misrepresentations by Dr. Kilpatrick, a jury could find that, as a lay person, plaintiff could reasonably have believed her condition caused the oxygen deprivation and resultant cerebral palsy.

Misrepresentations by Dr. Kilpatrick would toll the statute of limitation as to Dr. Rossi also, because the two doctors jointly treated Mrs. Oxley with respect to the birthing process, including preparation for the delivery, and were thus engaged in a joint venture. "The theory of joint venturers arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other. [Cit.]" *Kissun v. Humana*, 267 Ga. 419, 420 (479 SE2d 751) (1997) "A partner in a joint venture is liable for the wrongful acts of [his] partner committed in the ordinary course of business of the joint venture. . . ." *Block v. Woodbury*, 211 Ga. App. 184, 186-187 (2) (438 SE2d 413) (1993). Compare *Reeck v. Huntington Hosp.*, 626 NYS2d 516, 517 (1995); *Graddy v. New York Med. College*, 243 NYS2d 940, 943 (1963).

The trial court's grant of the defendants' motions for summary judgment is reversed.

On remand, the issue of the tolling of the statute of limitation should be tried first. If the jury finds it was tolled by fraud, then the issue of medical malpractice should be tried.

*Judgment reversed. Birdsong, P. J., concurs. Blackburn, J., concurs specially.*

BLACKBURN, Judge, concurring specially.

I concur with the majority's reversal of the trial court's grant of summary judgment to the defendants.

Mrs. Oxley's water broke spontaneously on the evening of September 1, 1987. Her treating physician, Dr. Kilpatrick, had diagnosed her as a "high risk" pregnancy as a result of her "incompetent cervix." Dr. Kilpatrick had previously surgically closed off her cervix, which procedure precluded vaginal delivery. When she arrived at South Fulton Hospital between 8:00 and 9:00 p.m., Dr. Rossi came into her room and she asked him who he was as she had never seen him before. She told him she wanted to see Dr. Kilpatrick. Dr. Rossi advised her that "he was Kilpatrick and Moore's associate, the third associate in the practice." On cross-examination, she was asked by Dr. Rossi's attorney: "Q. And how did [Dr. Rossi] identify himself? A. He was Dr. Rossi, third associate in Kilpatrick's practice." Dr. Kilpatrick also considered that Dr. Rossi was providing medical care for Mrs. Oxley, in his stead, based upon their mutual arrangement of each caring for the other's patients. Dr. Rossi acknowledged that he was responsible for Mrs. Oxley's care and considered her to be his patient during the period he treated her.

Dr. Rossi examined Mrs. Oxley and undertook her medical care. The fetal heart monitor was not activated for approximately one hour, and Dr. Rossi examined the fetal heart monitor printouts. Dr. Rossi spoke with Mrs. Oxley several times during the period he treated her, 8:00-9:00 p.m. through 7:00-7:30 a.m., and never told her the fetus was not doing well. In fact, he represented to Mrs. Oxley that the fetus was doing fine. Dr. Kilpatrick testified that the fetus was in distress beginning at 7:19 a.m. Dr. Kilpatrick further testified that a treating physician has a duty to advise the mother if the fetus is in distress or has a cord compression. Cord compression can cause thrombosis, which condition was present.

At approximately 5:00 a.m., September 2, 1987, after the frequency and intensity of her contractions had increased, Mrs. Oxley overheard the nurses saying they needed to get the doctor right away because the heart rate was becoming depressed during contractions. She asked one of the nurses what was going on and was told by the nurse that she would get the doctor. Dr. Rossi came into her room at approximately 6:00 a.m., and read the fetal heart monitor. Dr. Rossi expressed concern about the baby's condition and the cerclage, and cut the sutures soon after his arrival.

Approximately 45 minutes after the sutures had been cut, Mrs. Oxley noticed that the fetus' heart rate started dropping again and was staying depressed for several seconds. She asked the nurses and Dr. Rossi if the fetus was in trouble and they said nothing. At no time during his treatment of Mrs. Oxley did Dr. Rossi consider performing a C-section. Mrs. Oxley was concerned and asked for Dr. Kilpatrick. Dr. Kilpatrick was unaware of Mrs. Oxley's admission or condition when he coincidentally arrived at South Fulton Hospital to make his

routine rounds at approximately 7:00 a.m. Dr. Kilpatrick generally relied upon the physician who was covering for him to handle the patient care, rather than have the hospital call and advise him of the patient's presence or admission. Mrs. Oxley was advised that a C-section was going to be performed and she was taken into the operating room at approximately 8:00 a.m. The C-section was performed at 8:16 a.m., approximately 13 hours after the spontaneous rupture of the membranes.

It was apparent to Dr. Kilpatrick prior to delivery, as reflected in the pre-operative diagnosis, that there was fetal distress. The fetus also suffered from cord compression as reflected in the Operative Record. Late decelerations and fetal distress were also noted in the Progress Notes, and in the Pathologist's Report.

Summary judgment is appropriate only when the court, viewing all the facts and reasonable inferences from those facts in a light most favorable to the non-moving party, concludes that the evidence does not create a triable issue as to each essential element of the case. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Here, it is beyond dispute for summary judgment purposes that Drs. Kilpatrick and Rossi were jointly treating Mrs. Oxley during the relevant period of time. The record simply allows no other conclusion. Inasmuch as they were jointly treating Mrs. Oxley, they are jointly liable for any negligence which occurred during the relevant period. A jury question exists as to whether or not the alleged misrepresentations toll the statute of limitation for negligence during the relevant period.

DECIDED MARCH 12, 1997 —
RECONSIDERATION DENIED APRIL 1, 1997 —

*Davis, Gregory, Christy & Forehand, Hardy Gregory, Jr., Gary C. Christy, Steven K. Leibel*, for appellant.

*Love & Willingham, Daryll Love, Michael J. Hannan III, Webb, Carlock, Copeland, Semler & Stair, Thomas S. Carlock*, for appellees.